Next case is ENERGY NORTHWEST v. United States, 2010-51-12. We'll hear from Mr. Lester when you are ready. May it please the court. There are of the $56 million judgment that the trial court awarded to the plaintiff here, we are only challenging a little bit less than $10 million of that award. So we're not talking about a complete reversal here. We've tried to target this appeal to two limited issues that we do ask this court to reverse the trial court on. The first, as we talked about in our brief, is the court's failure to require the plaintiff to establish, as set forth in the Yankee Atomic decision from this court, the but-for world and to identify all costs that would have been incurred there so that it can be compared to the actual world cost to identify incrementality. Let me just do a question right at the end. Well, go ahead. You can lay out the framework. Well, the second issue is with regard to the interest on borrowings claim that violates both this court's and Supreme Court precedent. And so I don't forget to mention this. Let me just also mention that there are two other cases that are being argued this week before this court. Systems fuel cases being argued this afternoon and a second systems fuels case being argued on Thursday, both of which also deal with the interest issue, although both of those cases are plaintiff's appeals from a denial of a weighted average cost of capital markups to damages claims. But the briefing is fairly similar with regard to the interest issue there. But just so the court's aware. What about the site modification issue, the other issue about but-for causation? I think that the site modification issue is really pretty specific to this case in terms of the cases being argued before the court this week. But the general question of burden of proof pops up in several of the cases, I understand. It does. It does, Your Honor. Yes. Yes. Because there was an improper shifting of the burden of proof at some point. That's correct. That's correct, Your Honor. So just starting with the interest issue, the Supreme Court has made quite clear that unless there is a specific contractual or statutory provision that waives the government's sovereign immunity from the award of interest, interest cannot be awarded against the government. Now, sometimes this may seem unfair because that's not the rule that applies to private parties. But the Supreme Court in library of Congress v. Shaw did indicate that the sovereign immunity issue does place the government in a somewhat favored position. And it's a very long-standing rule. But your theory doesn't rest just on that proposition. Firstly, there's some ambiguity when to recognize if we were just dealing with the world where all we had was a statute and there's on a claim, there is a suggestion that interest is calculated on a claim and that doesn't have applicability to this kind of situation. Well, as this court has, and this court's predecessor, the Court of Claims, has held in several decisions, in Meierle, in J.D. Heaton, in Marshall, in Ramsey, and I'll quote from the J.D. Heaton case. Interest paid on bank loans made because of financial stringency resulting from a breach by the government of a contract between it and the borrower is not recoverable as an item of damage. And the J.D. Heaton court viewed the interest on borrowings as a issue precluded by sovereign immunity, both by the statute, 28 U.S.C. Section 2516, and this traditional just lack of waiver that preexisted even that statute, as the Supreme Court has discussed. And in reality, it is star, I'm sorry, except for Winstar. I mean, the difficulty I'm having is that we are drawing a lot of lines. We're not saying the rule applies, it's clear, and it applies in all circumstances. The government's view is that there are exceptions to that rule. There are. The court has created some exceptions. And not even exceptions, though, really, Your Honor. I mean, we could quibble. Let's talk about the Blue Bonnet case, which deals with the Winstar context. I mean, there we had a contract that dealt specifically with, and the purpose of the contract was for the contractor to obtain financing, to infuse into this thrift. Now, the breach of the contract required the contractor, then, to obtain additional financing. In that situation, this court allowed the contractor to recover the increased financing costs. Now, we could quibble here about whether or not the contract itself provides that waiver of sovereign immunity. I mean, generally, the government entering into a contract does constitute a waiver of sovereign immunity for contract damages. But the Supreme Court has held that that doesn't include interest. Now, the type of contract there, presumably, the court found that, or believed that that was sufficient to allow for an award of these financing costs. But here, we don't have a situation like that. Here, we have, really, a standard contract where there are services that were to be provided. And the issue that we have here, the costs that are financing that is incurred here, is to compensate the contractor compensating itself for the government's, for its delay in receipt of damages payment. Had the government, as the Supreme Court held in Shaw, interest and a delay factor both are designed to compensate for the belated receipt of money. What we have here is a contractor needing to build an asphyxia, a dry storage facility. It wasn't getting money from the government right then. Had the government paid money right then, there would be no loan at issue here. It would be paid. So the fact is, though, that they had to file suit. Now, they have a judgment. It's been several years. They went and got a loan to pay for it. I mean, in this circumstance or in others, there's an obligation on them to mitigate. So they aren't free to say, we're not going to do anything, because we're never going to be able to get our interest back, because everything we do, we're going to have to take out a loan, and the rate is 15%, so we're just not doing anything. They would be liable for having engaged in that mitigation, notwithstanding that a large portion of the funds that they commit are never going to be reimbursed. I don't know if in this specific situation they'd be liable for nothing. They'd be required to mitigate. They would have to take care of the fuel, yes. But even though in a traditional case between private parties, yes, perhaps interest payments would be recoverable against the government, the Supreme Court has made clear, sovereign immunity bars such an award. And J.D. Heaton and Meyerly are right on point with that and apply specifically to interest on borrowings. OK. Can I move? I'm sorry. Go ahead. I was going to move to site modification. Well, I'm all right. Well, let me just say, I take it your position is essentially this, that look, if they'd self-funded this project, they wouldn't have been able to recover the interest, and therefore, they can't effectively outsource the funding and then collect the interest. That's correct, Your Honor. And in our brief, we also talked about the very last argument in our brief, is that even if they could somehow recover interest, even because they elected to take out a loan, here, I mean, the case law is pretty clear that you have to have a necessity for the borrowing. Fram law says, was forced to borrow, necessitated. J.D. Heaton, financial stringency attributable solely to contract action, required to borrow, had to borrow. Here, there was no showing that they had to borrow. Here, they elected to, so they wouldn't have to use their equity account. But you don't regard that as a dispositive distinction. Well, they lose in both cases, as you see it. Yes, yes. But if we could turn to the site modification, while I defer to Judge Perks' question. Well, I was just going to, it seems like, assume for a moment that it would be impossible for Energy Northwest to know what task the government was going to choose in a non-breach world. How can then we give, place the entire burden on them to provide details enough to substantiate causation? Well, I think the court addressed this issue in the Bluebonnet case. We call it, I think, Bluebonnet 3. But that's what we refer to in our brief. So I don't have the specific site for which Bluebonnet it is. But in our brief, it's Bluebonnet 3. There, this court said, yes, it can be difficult to identify this. I mean, there is some speculation involved in developing it. But it is the trial court's job to, even though it's difficult, it's necessary for the trial court to do its best to create, and I quote, as accurate an assessment as possible of what the but-for world would look like. And so in the trial court, although we don't know exactly what task the government would have brought in the but-for world. But there were a lot of parameters that sort of place it into a pot so that the court could give some specificity the types of costs that would be necessary and would be able to put them together that way. So the idea that the plaintiff can, and the idea is that the plaintiff has to come forward with some sort of showing. The question is, when does the burden shift? Or if we don't want to talk about burden shifting, when does the government have a responsibility to come up with some sort of rebuttal evidence, given that they're the ones that arguably hold the cards in terms of certainty? Well, in this particular case, Your Honor, the government did present evidence about not what the specific task would be. We don't have a task model number. Things never advance to that point. But there was testimony from DOE employees and expert witnesses about the parameters of the task. What would it be like about the size, about certain technical aspects of it that would be required no matter what? Now, given that evidence, certainly the contractor who owns the site and knows its facility could take that information and say, well, given these parameters, this is what we would have to do in our site. OK, so where does all this, this is all getting quite confused, because we're talking about the facts here. But I thought the real issue for the government with respect to site modifications weren't the particular facts, but the overall argument that the court of claims judge misassigned the burdens with respect to who had what. So could you kind of address that? Well, here, I mean, basically, the contractor, and we didn't contest that dry storage would be necessary at this facility at some point in time. So we were contesting, basically, the types of costs that we're talking about here. There were some other costs that we contested that were not challenging on appeal. But what the plaintiff didn't do was, with regard to the specific types of plant and site modifications that we're talking about here, which is having to do certain things in its wet pool so that it could remove fuel. Those are costs that we would say, well, why wouldn't those have been necessary, even if the government had timely performed? You're going to have to take your task out of that wet pool anyway. So there were certain seismic activities that the contractor engaged in. Why can't you show us why you wouldn't have done those in the wet pool world? And given that they're the master of their site, they should be in the best position to establish that, in fact, if the government had timely performed, oh, we wouldn't have needed to do those seismic activities. I take it everybody, maybe I'm wrong, so correct me if this is wrong, but I took it that everybody, this is a partial breach case, or at least we're treating it as a partial breach case, correct? Correct. So what that means is that the notion is, whether it's counterfactual or not, the notion is, at some point, the government will pick this stuff up, will begin performing it, correct? That is correct. The whole structure of the damages argument is predicated on that underlying assumption. That's true. So isn't it the case that in a partial breach case, you don't look at what the but-for world would look at, you look at what the to-come world looks like? Because it seems to me that what you're asking in a case like this, as long as you're looking at it as a partial breach case, is, are we spending money now that we won't have to spend again when there's ultimate performance, or are we spending money now, which unfortunately, we're likely to have to spend again when performance ultimately occurs, even if in the but-for world, we wouldn't have had to? We're looking ahead to 5, 10 years, or whenever this pickup starts. If the government is going to be using a different system of some sort, then we'll have to do more work on the site modification. Isn't that the question that we and the court should be focused on? Well, two answers, Your Honor. First, that idea conflicts with what this court held in Yankee Atomic, which was, we're looking at basically a period of time in a partial breach case. We're looking at the costs that have been incurred so far. And the contractor can recover those costs. They can't recover future costs yet, because it hasn't incurred them. But basically, it'll come back periodically. Well, this is a cost that it has incurred. The question is, is this cost going to be, in effect, a cost they won't have to pay again later? But that is the question, isn't it? Rather than what, the but-for world question, which is a total breach type inquiry? Let me answer two ways. Let me finish with Yankee. First, in Yankee, this court held that what the trial court needs to do is look at the but-for world, establish what it is, and then see what the costs that have been incurred are, and judge incrementality that way. And the idea is that the contractor, just because there's a breach, it can't just recover all its costs. There are a lot of costs that the contractor incurs, especially here where we have an operating reactor. No matter what the government did, this contractor is going to incur a lot of costs, because it is running a nuclear power plant on an active, ongoing basis. So just because there are costs incurred at the plant doesn't mean that they're somehow associated with the breach, or that they wouldn't have been incurred irregardless of the breach. And we don't want to compensate the contractor and put him in a better position than he would have been, had there been no breach. We don't want him to recover extra costs that he would have incurred anyway. So by creating the but-for world that this court in Yankee mandated, and comparing it to the actual world, we're able to identify that lack of incrementality. The problem with trying to guess what will happen in the future is, quite frankly, we don't know what will happen in the future. But in Carolina Power, that's the kind of analysis the court engaged in, the future analysis. So I guess I'm having a hard time seeing what the difference is, when you go in the Yankee atomic pool and when you go in the Carolina Power. Well, in Carolina Power, where the court said, well, there are going to be cask-loading costs in the future, and there are certain cask-loading costs now, but there are going to be these cask-loading costs in the future, then we'll, instead of avoided, that costs that were avoided, instead of there being avoided costs now, we'll say, because they were deferred, we'll deal with those costs if and when they aren't incurred in the future. But here, we don't have costs that are avoided. We have costs that they, at the point of fear, actually incurred, that aren't going to be incurred in the future. For example, seismic analysis of the wet pool. But how do we know? This fuel's been taken out of the wet pool. This fuel's been taken out of the wet pool. It's on a dry storage pad now. Why would we have a wet pool seismic analysis when the fuel is on this dry storage pad? I thought the seismic, well, there are several different things going on with prohibitions against bad consequences from seismic activity, I guess. But I thought the seismic protective equipment was cask-specific. Well, that's certainly the plaintiff's argument. But here, in our evidence, the testimony that we put in is that given the parameters of the type of cask, the same type of activity would have been necessary in the but-for world. But because this fuel's been removed from the wet pool, it won't be necessary in the actual world in the future. So it's not a deferred cost. It's a cost that has been incurred, and that the same cost would have been incurred for the same activity in the but-for world. Would have been incurred or will be incurred. Would have been. And it was incurred. And even if there were absolutely clear evidence that you no longer have access to the kind of cask or whatever that you would have produced in 1998, which would have saved EN from having to come up with a whole new different type of site modification. And even though it's very clear that when you ultimately perform, whenever it happens, they will have to spend this extra money. Even if all that were clear, you would say you still look at the but-for world back in 1998 to determine whether there's damages? Well, we look to see if there's incrementality. I mean, so if there is that. I think your answer is yes to my question, right? You're saying that if the site modifications that EN did would have been required by and not required to be duplicated, given what the government would have provided by way of casks in 1998, then you don't care whether the government's going to require them to pay again for site modifications because you're going to change the casks down the road. If there are going to be different modifications in the future that differ from what would have happened in the but-for world, then yes. But those would be recoverable as damages when they're incurred. I see. So you're saying that those are, even if you can prove positively that those changes will occur and that they will have to pay again, they don't get that part of the judgment in this case. I think you're saying that there'd be different costs and different site modifications in the future. So yes, they would not be able to recoup the costs that they would have incurred in the but-for world and did incur now. But if they have to incur these costs in the future for other site modifications, then those would be recoverable because of the breach, because of the partial breach. Your Honor, I see my time is up, I think. We've helped you use it up. We'll give you four minutes to rebuttal back. Thank you, Your Honor. Mr. Hirsch? Thank you, Your Honor. May it please the court. The government, as I recognize, is challenging about $10 million, a $56.8 million judgment in this case. Two of the issues the government raises in this appeal, the plant modifications and overhead issues, are classic fact questions upon which the court heard substantial evidence and reached a correct determination. The third issue regarding recovery of financing costs is an issue where the government is seeking to expand the boundaries of the statutory no interest rule to preclude mitigation damages. Just turning to your point, I mean, I think, in fairness to the government, their argument with respect to site modifications is also kind of a legal question of who had the burden. And it does appear to me, reading the court of claims opinion, at least in a few portions, the court explicitly talked about the government not carrying its burden. In their view, that is a matter of law. They didn't have the burden. You all had the burden. So what am I wrong about that? And if I'm not wrong, could you respond to that argument? Sure, Your Honor. I think that the fair reading of the trial court's opinion is that he put the initial burden on Energy Northwest to prove what Yankee Atomic requires, which is a plausible non-breach case. And that was our burden. As part of that burden, Energy Northwest put on evidence, as called for under Yankee Atomic, that if the government had performed, it wouldn't have to have built this dry storage facility. Energy Northwest also put on evidence, as part of its case under the non-breach world, that the modifications that it actually performed in the breach world were specific to the Holtec cast, and that it would have to repeat that work or redo it, essentially, when the government performs. That was precisely the issue that this court framed in Carolina Power. Is the utility going to have to redo the work that they performed when they did the site modifications in the breach world? Are we going to have to do that work over? And the evidence that Energy Northwest put on through two fact witnesses and an expert was that the site modifications were specific to the Holtec cast, the storage cast, and would have to be redone when the government performed. At that point, I think the burden did shift to the government to establish to the contrary, to prove that, in fact, the cast that would have brought, that we don't know the nature of, would not have required additional modification. But I think we carried, Energy Northwest carried the initial burden. Well, the court frequently characterized what the government was seeking as an offset. And their view is that, I mean, that's what kind of helps push it along past the Yankee atomic analysis into the Carolina power analysis. And it seems to me that it may be problematic to have cast it that way. I don't know. Maybe that's the government who said it. But it seems like the court of claims decided what it did in part because it was its characterization of the government's claims. And I'm not sure that was a fair characterization. Well, I believe that is an accurate characterization of what the government's position here. Government's position really is no different than Carolina power. The government was saying that, essentially, if you load cast, if you would have loaded cast in the non-breach world, you would have incurred the site modification costs. That lines up, I think, almost perfectly with the Carolina power decision. And the exact same analysis that this court applied in Carolina power applies in this case. You look to see whether the utility is going to incur similar costs in the future when the government actually performs. And that's what the trial court heard gives me extensive evidence. Help me with this. I'll ask you the same question I asked Mr. Lester, which is, are we looking at the but-for world, or are we looking at the will-occur world in a partial breach setting? You understand the problem I'm having, because I'm hearing both of you talking a lot about but-for. But my understanding is that that is really peculiar to a total breach case, and not a partial breach case. And I agree, Your Honor. And I think that in the Carolina power case, this court, in fact, relying on the discussion of the one-time fee issue in the Yankee atomic issue, has said these are partial breaches. These are not total breach cases. And the government will perform in the future. And the relevant question is whether this utility will have to incur these costs in the future when the government performs. That's the fact issue that we presented for the trial court. That's what we put our evidence on. How is this distinguishable, then, from the facts in Yankee atomic? Well, Yankee atomic, well, first of all, Yankee atomic itself applied the partial breach analysis to deal with the one-time fee issue. So this court's analysis in Carolina power originally stemmed from Yankee atomic. Yankee atomic involved a slightly different issue. But Yankee atomic did apply in the but-for world versus the breach world versus the non-breach world. They compared that, right? Yankee atomic said that the utility had an obligation to take the acceptance rate that this court determined in the PG&E case and establish that it could have avoided building a dry cast storage facility if the government had performed at that rate. That is, as I said, part of the proof we presented that that issue is not even on appeal here. We have the separate issue about what do we do about these costs that, as Carolina Power pointed out, are likely to be incurred in the future when the government actually performs. Mr. Hirsch, what about the interest issue? Why isn't the only exception where there's a changes clause? Well, I think that the question of financing or interest costs here is an issue where there are several lines of authority from this court that would support a recovery of interest costs here. One of those lines of authority, as your honors pointed out, was the Winstar cases, where the plaintiff was permitted to recover financing costs, borrowing costs, caused by the breach here. And so those cases support that position. Another line of cases that the trial court pointed out were the Wickham case, the Wickham case, and some of the other cases, where the court did permit recovery of financing costs if the plaintiff could prove a specific borrowing that was attributable to the government's action, which is what we say occurred here. Now, the government says, well, those cases are all distinguishable because those are changes clause cases. And first of all, this court didn't rely on the changes court or refer to the changes clause in the Wickham case. And secondly, the changes clause that the government has cited or identified does not create an explicit exception to the no interest rule. It doesn't have a waiver of the no interest rule. But that's less challenging of a statutory position when you're referring to a contractual position. It's in the contract. Even if not explicitly. Well, I think at some level, the government is trying to explain the results in the Winstar cases and the results in the Wickham cases by saying, well, there are some implied exceptions. It's a case involving financing. It's a case involving a changes clause. I think it would be a better approach here to say, look, these kind of costs which we incurred, which were mitigation costs, as the judges mentioned. These were mitigation costs that clearly were required because of the government's breach. That's not on dispute. To say those kind of costs don't fall under the parameters of the no interest rule. How do you distinguish England, then, on that basis? England, Miley, there's Komatsu, I think, are cases where this court said, we're not going to permit a contractor to recover where it has to borrow to finance its own performance under the contract. Its own performance under the contract. We're not talking about Energy Northwest financing its performance under the contract. Energy Northwest was waiting for the government to perform. Energy Northwest, in fact, had paid $150 million in advance and counting for the government to perform. The government didn't perform, and Energy Northwest was faced with building this dry cast storage project. Well, that's its performance, in effect. It's taking steps to accomplish what the government had undertaken, but failed to accomplish under the contract. Judge, I think that's a fundamentally different situation from the Miley cases, because we're not talking about our underlying contract performance. We're effectively required, because of the breach, to provide substitute performance under the contract. And I think that does put this out of the range of the Miley cases. And I think the other thing you have to look at is the last time the Supreme Court addressed this issue. The Supreme Court in the Library of Congress said, what was the no interest statute about? It was about preventing contractors from recovering for, quote, belated claims based on, quote, belated receipt of funds. Belated receipt of funds. And you can explain the result in Miley, Hedlund, and Camazzo as cases where, OK, the government took some action. There was some delay. And the contractor had to go out and finance its own performance under the contract. This is a fundamentally different situation. As I said, the government breached here. The government required our client to mitigate. The government required it to build a dry cast storage project. And the client went out and financed that project. It was the largest capital project that this client had incurred since it built the nuclear power plant. Now, the evidence also showed that the client believed that it would place an unacceptable burden on its rate payers and the public utility districts to have to finance this very large slug of capital costs without financing, that they would have to effectively pass through these costs to the plaintiff. Would you agree that if they had decided to simply self-finance this, that they wouldn't have been entitled to interest on that? Your Honor, I don't know that that question was presented. I think under some of this court's authority, I think that if it had self-financed, it would not have been recovered. But I think this client felt that it didn't have any choice but to finance. And I will say, Your Honor, that the Wickham and the Gieben line of cases established two prongs here. One of the prongs is to say you can prove a specific borrowing tied to the breach, which is what we did here. And the other prong is to prove that it was necessary to finance. Now, if Your Honor, if you don't have any more questions about the interest issue, I did want to go back for a minute to the plant mods. Because there was a discussion in here about seismic modifications. And I think this is pretty instructive. The seismic modifications here was to develop a device so that the cask would not tip over in the case of an earthquake, and also to develop some restrictions so that the cask wouldn't tip over in the pit or the cask pit rack where they were going to load it. And the evidence clearly was that those seismic devices were specific to the Holtec cask, that they were engineered for, designed for, and built for the storage cask that was used in this case. And the evidence was that when the government shows up with a different cask, this client, or this Energy Northwest, is going to have to develop a different device. Because that Holtec, excuse me, the seismic devices they came up with were designed specifically for the cask. Now, the universe of devices that are subject to the modification, equipment modification claim, I take it, are the ones that are listed by the trial court at appendix 23, the right-hand column? That's correct. OK, and that's, there's a little uncertainty in the briefs about exactly what we're talking about. But I think we can agree, can we not, that that's what we're talking about with respect to this? Yeah, there was some uncertainty because the government didn't identify specifically all those modifications. But that's what everybody, we've now agreed that that's what we're talking about. And it's instructive, I think, that one of those modifications is also that we should have, we would have had to develop procedures to load DOE casks. Well, of course, this client, the evidence was that when the DOE shows up with a cask, the client will have to develop different procedures if it's not required under the contract. Actually, the contract requires the DOE to provide procedures to load casks. So that particular example, I think, is not a very good example for the government. Thank you, Mr. Hirsh. Thank you, Your Honor. Lester has a little rebuttal time. Thank you, Your Honor. Just briefly, with regard to the burden issue on the plant site modifications, the trial court clearly put the burden on the government. It did not require the plaintiff to identify how it would have removed SNF from the pool had DOE timely performed. So instead it put the burden on the government to prove that, and then said it's too speculative, which conflicts with both Yankee and the whole blue bonnet measure of the court has to, even though it's difficult, identify the but-for world. And Yankee, specifically. Well, they did have some testimony about this 90%, right? Mr. Bush said there's a 90% chance. But there's no finding by the court. I mean, there was conflicting testimony presented to the court. There's just no finding by the court. Instead, the court just put the burden on the government and said it's too speculative to do anything. So your quarrel, I take it, on this issue is really with the portion of the court's opinion on the left-hand side of 23, starting with as the burden of proof in determining offsets is on the government, the court will not reduce the damages by the cost of the fabrication. Right. Because these are proceeding. We're not talking about offsets here. We're talking about establishment for causation. I understand you don't like the use of the term offset. But crediting that as being a kind of loose term for what we're talking about. But you would say that demonstrates the inappropriate allocation of burdens and the disposition turning on that allocation. That, coupled with the fact that there was no identification by the court or by the plaintiff of the, as quoting from Yankee, the contractually-defined hypothetical world and the costs that types of activities that would have been necessary there. Because of that, the court couldn't, as per Yankee, it could not perform the necessary comparison between the breach and non-breach worlds, and thus could not accurately assess the Yankees' damages, specifically meaning incrementality there. With regard to the interest issue, the Supreme Court has plainly said, in the absence of an express waiver of sovereign immunity authored by contract or statute, there is no interest. The plaintiff has said that, well, the Meyerly, the J.D. Heaton cases all deal with related receipt of funds. But that's exactly what we have here. The government didn't pay damages as they were incurred, so the plaintiff had to wait for payment to compensate itself for that delay and went out and took out a loan. So now it wants the government to pay both its damages and the interest that it paid to get that money early. So this is a belated receipt of funds. So even if those cases could be narrowly tailored into that delay in payment category, this case fits that. The Bell case specifically, the whole Bell line of cases specifically depends upon not only the Changes Clause, but in Bell they talk about a 1954 Department of Defense instruction that changed DOD policy on the recovery of interest on borrowings. And so coupled with that, the Bell court changed its policy with regard to recovery of interest on borrowings in the limited area that the court's cases through Gavin have developed that. But in J.D. Heaton, both in Bell and in J.D. Heaton, both of those courts, both court of claims decisions specifically discuss the distinction between cases involving that Changes Clause and breach cases. J.D. Heaton specifically refusing to award interest on borrowings and discussing Bell as dealing with a Changes Clause, not a breach case. The same with regard to Winstar. There is a case we cite in our reply brief called Phillips, which is very similar to the type of financing contract that was at issue in Winstar. There, the Capehart Act required, the purpose of the contract was to require the contractor to obtain financing. And there, a court said that in that instance, like in Bluebonnet, the contractor could recover the extra financing costs resulting from the government's breach. But in J.D. Heaton, again, the court of claims specifically distinguished that type of contract from other contracts like we have here, more service or goods-oriented contracts that don't involve financing arrangements. And finally, the plaintiff said that it had no choice to but to take a loan. As we discussed in our brief, there's no evidence of that. In fact, the opposite of that, there was no evidence that there was any necessity for borrowing and that the plaintiff could, in fact, have used equity capital instead of taking a loan. Let me just ask one other question about your characterization of the Winstar cases. I mean, it seems to me that, yes, it was probably anticipated that the Winstar plaintiff's obligations would be acquitted by financing, but that wasn't part of the contract typically, was it? I thought that the contract was you're gonna acquire these failing thrifts and you're gonna be credited with all sorts of special accounting benefits. And we don't really care, we, the government, don't really care whether you acquire those thrifts because you're Google and you have a ton of cash lying around and you just devote the cash to that acquisition or what? My understanding of it, now, the reading of this case might differ from this, but my understanding is that, in fact, it was anticipated that the contractor would, in fact, obtain, in that particular case, would obtain, go and get investors, get financing for cash to be infused into the acquired thrift, that it was not gonna simply. But it could just take its own cash, presumably, and use that to support the thrift. I didn't understand there to be any contractual prohibition against it, it's just impractical. Well, like I said before. In most cases. We could quibble about whether or not the contract language there is sufficient to waive the government's sovereign immunity with regard to financing costs. But here we have a very different type of contract  to resolve that issue here. I understand. Thank you, Your Honor. Thank you. Mr. Lester, the case was well-argued on both sides, and we'll take it under advisement.